1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

BERMUDA ROAD PROPERTIES, LLC, a
Nevada limited liability company,                )
                                                 )
                    Plaintiff,                   )
                                                 )
          v.                                     )        2:12-cv-1579-RCJ-VCF
                                                 )
ECOLOGICAL STEEL SYSTEMS, INC., a                )        **ORDER**
Delaware corporation, d/b/a ECOSTEEL,            )
                                                 )
                    Defendant.                   )
_____ )

Currently before the Court are Bermuda Road Properties, LLC's Motion for Summary
Judgment (#15) and Motion to Dismiss Ecological Steel System's Counterclaims (#16).

**BACKGROUND**

**I.    Complaint**

On September 5, 2012, Bermuda Road Properties, LLC ("Bermuda Road") filed a
complaint in this Court, based on diversity jurisdiction, against Ecological Steel Systems, Inc.
("EcoSteel"). (Compl. (#1) at 1-2). According to the complaint, Bermuda Road was a Nevada
limited liability company with its principle place of business in Nevada and Ecosteel was a
Delaware corporation with its principal place of business in Utah. (*Id.* at 1). The complaint
alleged the following. (*Id.* at 2). Bermuda Road owned undeveloped property near Bermuda
Road and Sunset Road in Las Vegas, Nevada (the "Property"). (*Id.*). Bermuda Road intended
to construct a meeting facility on the Property (the "Project"). (*Id.*). On March 17, 2012, the
parties executed a "Services and Purchase Agreement" (the "Agreement"). (*Id.*). The
Agreement contemplated that EcoSteel would service, design, purchase, supply, then erect
the steel required to construct the Project. (*Id.*). In order to perform under the Agreement,

1   EcoSteel needed a Nevada state contractor's license pursuant to NRS Chapter 624.  (*Id.*).
2   EcoSteel did not have such a license and could not perform.  (*Id.*).  EcoSteel had not
3   registered as a foreign corporation with the Nevada Secretary of State.  (*Id.*).  Before Bermuda
4   Road was aware that EcoSteel did not have a Nevada state contractor's license, it forwarded
5   approximately $2.1 million as a down payment to EcoSteel pursuant to the Agreement.  (*Id.*).
6   Bermuda Road demanded the return of the down payment.  (*Id.* at 3).

7   The complaint alleged two causes of action.  (*Id.*).  In the first cause of action, Bermuda
8   Road sought declaratory relief that EcoSteel could not perform under the Agreement because
9   it did not have a Nevada contractor's license and that the Agreement was illegal and could not
10  be enforced under NRS § 624.320.  (*Id.*).  Bermuda Road sought declaratory relief that the
11  Agreement was illegal, unenforceable, null, and void.  (*Id.*).  In the second cause of action,
12  Bermuda Road alleged unjust enrichment because it had conferred a substantial benefit upon
13  EcoSteel in the form of the down payment for which EcoSteel had not reimbursed Bermuda
14  Road.  (*Id.*).  Bermuda Road sought to recover in *quantum meruit*.  (*Id.* at 4).

15  **II.    Counterclaim**

16  In response, EcoSteel filed an answer and counterclaim on October 3, 2012.  (Answer
17  (#12) at 1-6; Counterclaim (#12) at 7-14).  In the answer, EcoSteel admitted that it had not yet
18  obtained a Nevada contractor's license and that it had not yet registered with the Nevada
19  Secretary of State.  (Answer (#12) at 2).

20  In the counterclaim, EcoSteel alleged the following.  (Counterclaim (#12) at 7).  The
21  parties had entered into negotiations for the design, fabrication, and delivery of engineered
22  steel panels for the Project through a transaction broker.  (*Id.* at 8).  EcoSteel initially offered
23  to design, fabricate, and deliver Bermuda Road's engineered steel panels to Nevada.  (*Id.*).
24  However, Bermuda Road wanted a fixed price for the steel design, fabrication, delivery, labor,
25  and steel erection costs.  (*Id.*).  EcoSteel told Bermuda Road that "as a design manufacturer
26  it [did] not provide labor and steel erection services but that it had contacts in the industry that
27  could provide those services."  (*Id.*).  Bermuda Road requested that EcoSteel include the costs
28  of labor and steel erection in its fixed-price bid.  (*Id.*).  EcoSteel included those costs in its bid

2

after advising Bermuda Road that it could not furnish the labor for steel erection "but that they would put [Bermuda Road] or the general contractor in touch with a licensed steel erector." (*Id.*).  On March 17, 2012, the parties entered into the Agreement.  (*Id.*).  The scope of EcoSteel's services under the Agreement was limited to preparing products for shipment and delivering them.  (*Id.* at 9).  Bermuda Road made the first payment of approximately $2.1 million dollars in connection with the execution of the Agreement upon which EcoSteel immediately began the design and engineering for the steel panels.  (*Id.*).  On several occasions thereafter, Bermuda Road changed key design elements which required EcoSteel to redesign and reengineer the steel panels.  (*Id.*).

The counterclaim alleged the following.  (*Id.*).  The parties and the general contractor held regular meetings to discuss design and engineering details and the progress of the general contractor's work in readying the site for construction.  (*Id.* at 10).  On June 12, 2012, they held a meeting and EcoSteel again advised the general contractor and Bermuda Road that it did not have a license to erect the engineered steel panels.  (*Id.*).  EcoSteel provided its design and engineering information to the municipal building department and re-submitted elements to the building department as necessary based on Bermuda Road's requested changes.  (*Id.*).  At the time Bermuda Road filed its complaint, no building permit had been issued but neither the muncipality nor Bermuda Road had raised any issues with EcoSteel about the structural design work performed and submitted.  (*Id.*).  After completion of the engineering, Bermuda Road was required to send EcoSteel a "Production Order" so that EcoSteel could order the raw steel to begin fabrication of the products.  (*Id.* at 11).  Although some design details had not been finalized, Bermuda Road sent EcoSteel the Production Order on August 2, 2012 believing that a permit would be issued on August 15, 2012.  (*Id.*).  Pursuant to the Agreement, once a Production Order was placed the Agreement could not be terminated by the buyer and the buyer shall be responsible to accept delivery of all products and to pay all fees and compensation under the Agreement.  (*Id.*).  Bermuda Road rescinded the Production Order on August 4, 2012.  (*Id.*).

The counterclaim alleged two causes of action.  (*Id.* at 11-12).  In the first cause of

3

1    action, EcoSteel alleged breach of contract against Bermuda Road.  (*Id.* at 11).   On

2    September 6, 2012, Bermuda Road sent EcoSteel a letter which rescinded the Agreement and

3    demanded a return of all funds paid.  (*Id.*).

4          In the second cause of action, EcoSteel alleged quantum meriut/unjust enrichment

5    because it had conferred a substantial benefit upon Bermuda Road in the form of steel

6    fabrication estimation costs, design and engineering work, and related information and

7    services.  (*Id.* at 12).  Bermuda Road had been enriched by EcoSteel's actions and it would

8    be inequitable to allow Bermuda Road to retain the benefits without compensating or

9    reimbursing EcoSteel.  (*Id.*).

10          EcoSteel attached the following exhibits to the counterclaim: (a) the Agreement, (b) a

11   notice of commencement signed by Bermuda Road on August 2, 2012 and notice of

12   modifications to original plans; (c) an email dated August 4, 2012 from Bermuda Road stating

13   that the production notice release had been rescinded and that EcoSteel should stop

14   production; and (d) a letter from Bermuda Road's attorneys dated September 6, 2012

15   demanding acknowledgment that the Agreement was null and void.  (*See* Exhibits (#12-1)).

16   **III.    Services and Purchase Agreement (the "Agreement")**

17          The parties entered into the Agreement on March 17, 2012, whereby "EcoSteel

18   desire[d] to sell to Buyer certain pre-engineered building components and related goods and

19   services as more specifically described on Exhibit 'A' & Exhibit 'B' to this Agreement."

20   (Agreement (#12-1) at 2).  Under scope of services, the Agreement stated:

21          Except as otherwise provided herein, EcoSteel's scope of supplies and services
            related to the Products pursuant to this Agreement is limited to preparing for
22          shipment and delivering the Products to Buyer's Ship To Address.  (*Id.*).  The
            Products are sold unassembled and except as otherwise provided herein, Buyer
23          has sole responsibility for selecting the delivery site, site preparation, erection
            of the Products, suitability of the Products for Buyer's intended use, assembly
24          of the Products, and compliance with all appliable law, rules and ordinances.

25   (*Id.*).  Under payment, the Agreement stated that "[i]n no event shall payment of any of the

26   fees and compensation due under this Agreement be contingent on any items involving

27   materials or labor not provided by EcoSteel or any items outside the scope of work of this

28   Agreement."  (*Id.*).

                                              4

The Agreement's design code and structural specifications section stated the following:

> Buyer or Buyer's site engineer shall review all design load criteria, live loads, wind loads, collateral loads, dead loads, roof loads, seismic loads, snow loads, zone criteria, and other relevant criteria to verify that such criteria meet or exceed the building code requirements of the local jurisdiction where the Project is being constructed.  EcoSteel will cooperate with Buyer or Buyer's site engineer and provide and provide all reasonable and relevant frame information necessary to complete foundation and site design, including anchor bolt locations and sizes, frame structural calculations, and reaction force diagrams. In addition, EcoSteel will provide structural drawings wet stamped by a structural engineer licensed in the state where the Project is located.

(*Id.*).   The Agreement stated that it "along with all Exhibits that are, or may be, attached to this Agreement, constitute[d] the entire agreement between the Parties and supersede[d] all prior agreements and understandings, whether written or oral, relating to the subject matter of this Agreement."  (*Id.* at 3).  The Agreement stated that "[i]n the event that any provision of this Agreement shall be invalid, illegal, or otherwise unenforceable, the validity, legality, and enforceability of the remaining provisions shall in no way be affected or impaired thereby."  (*Id.* at 4).

Exhibit A demonstrated that Phase A involved the permit stage and that Phase B involved production/construction once the permit was issued.  (*Id.* at 6).  EcoSteel planned to "shop drawings" to an architect and a steel erector.  (*Id.*).

Exhibit B described EcoSteel's services as engineering, detailing, and project management.  (*Id.* at 8).  Specifically, EcoSteel was to "provide architectural design review, 3D structural modeling, structural engineering, steel detailing services, project management, and all drawings relevant to EcoSteel's scope of work for an approximately 90,000 square foot Commercial conference and training center.  Additional architectural services not provided by EcoSteel include[d], but [were] not limited to mechanical, electrical, plumbing, foundation, and interior finish details."  (*Id.*).  EcoSteel planned to provide project management services "from initial design to completion."  (*Id.*).  EcoSteel planned to provide the following project drawings: (1) structural engineering plans and details stamped by structural engineer licensed in build state; (2) stamped anchor bolt plans; (3) architectural plans, sections, and details; (4) steel detailing, framing, and erection plans; (5) insulated panel and trim detail plans; (6) cross

1   sections, wall sections, and details; and (7) shop drawings and bills of materials.  (*Id.*).

2   Under pricing and order details, the project goods and services were itemized under the

3   following categories: (a) steel structures; (b) wall and roof insulated panels; (c) floor framing

4   and decking; (d) trim, fasteners, and misc.; (e) design, modeling, and steel detailing; (f)

5   structural engineering; (g) labor–structural steel, panels, and trim; (h) freight; and (i) project

6   management.  (*Id.* at 13).  Under labor, the details stated that the "steel erector provided by

7   Ecosteel shall have all Licenses, insurance and Certifications needed to erect the steel in

8   Clark County."  (*Id.*).  The labor description stated "[i]nstallation for all primary and secondary

9   steel, steel pan deck, wall and roof panels and associated exterior trim."  (*Id.*).   Under project

10   management, the details stated "[o]n-site Project Manager during initial delivery phase and

11   final punch list inspections.  Remote project management through all phases of the project

12   through completion."  (*Id.*).  The total contract price was for $5,381,500.  (*Id.*).  The labor cost

13   accounted for $665,000.  (*Id.*).

14   **LEGAL STANDARD**

15   In reviewing a motion for summary judgment, the court construes the evidence in the

16   light most favorable to the nonmoving party.  *Bagdadi v. Nazar*, 84 F.3d 1194, 1197 (9th Cir.

17   1996).  Pursuant to Fed.R.Civ.P. 56, a court will grant summary judgment "if the movant shows

18   that there is no genuine dispute as to any material fact and the movant is entitled to judgment

19   as a matter of law."  Fed.R.Civ.P. 56(a).  Material facts are "facts that might affect the outcome

20   of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106

21   S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).  A material fact is "genuine" if the evidence is such

22   that a reasonable jury could return a verdict for the nonmoving party.  *Id.*

23   The moving party bears the initial burden of identifying the portions of the pleadings and

24   evidence that the party believes to demonstrate the absence of any genuine issue of material

25   fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265

26   (1986).  A party asserting that a fact cannot be or is genuinely disputed must support the

27   assertion by "citing to particular parts of materials in the record, including depositions,

28   documents, electronically stored information, affidavits or declarations, stipulations (including

6

those made for purposes of the motion only), admissions, interrogatory answers, or other materials" or "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A)-(B). Once the moving party has properly supported the motion, the burden shifts to the nonmoving party to come forward with specific facts showing that a genuine issue for trial exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252, 106 S.Ct. at 2512. The nonmoving party cannot defeat a motion for summary judgment "by relying solely on conclusory allegations unsupported by factual data." *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Matsushita*, 475 U.S. at 587, 106 S.Ct. at 1356.

## DISCUSSION[1]

Bermuda Road filed a motion for summary judgment on its complaint. (Mot. for Summ. J. (#15) at 2). Bermuda Road asserts that the Court may grant summary judgment because EcoSteel failed to register as a foreign corporation with the Nevada Secretary of State. (*Id.* at 6). Bermuda Road argues that the contract is void *ab initio* because EcoSteel is not a licensed contractor pursuant to NRS § 624.020. (*Id.* at 6-7). Bermuda Road asserts that EcoSteel is a contractor within the meaning of the statute because the Agreement called for $665,000 worth of construction. (*Id.* at 7-8). Bermuda Road asserts that the Agreement

---

[1] The Court will consider Bermuda Road's motion for summary judgment (#15) on its own complaint and Bermuda Road's motion to dismiss (#16) EcoSteel's counterclaims together because the parties make the same arguments in both. The Court notes that EcoSteel attached the same exhibits to its opposition to the motion to dismiss as it did to its opposition for the motion for summary judgment. (*Compare* Opp'n to Mot. to Dismiss (#21), *with* Opp'n to Mot. for Summ. J. (#22)). For that reason, the Court converts Bermuda Steel's motion to dismiss into a motion for summary judgment on the counterclaims. *See* Fed. R. Civ. P. 12(d) (stating that if the district court relies on materials outside the pleadings in making its ruling, it must treat the motion to dismiss as one for summary judgment and give the non-moving party an opportunity to respond).

1    cannot be severed because the entire Agreement falls under NRS Chapter 624.  (*Id.* at 8).

2    Bermuda Road argues that no exception applies to warrant unjust enrichment for EcoSteel.

3    (*Id.* at 11).  Bermuda Steel relies on the case of *Interstate Commercial Bldg. Serv., Inc. v.*

4    *Bank of Am. Nat'l Trust & Sav. Ass'n*, 23 F.Supp.2d 1166 (D. Nev. 1998) to support its

5    arguments.  (*See id.* at 7-14).

6          In support of the motion for summary judgment, Bermuda Road submitted: (a) the

7    declaration of Dieudonne Nkwethat, Bermuda Road's property manager; (b) the Agreement;

8    (c) a copy of the wire transfer from Bermuda Road to EcoSteel in the amount of $2,152,600;

9    (d) an email from Bermuda Road to EcoSteel dated August 6, 2012 requesting a "bill of

10   materials list breakdown with weights and tonnages for each category" and "materials

11   suppliers and the fabricators different locations" and EcoSteel's response that they were "not

12   willing to provide this detailed information" to Bermuda Road at that time; (e) an email, dated

13   August 6, 2012,  from Bermuda Road to EcoSteel asking "who the steel was purchased from

14   and the status of the steel"; and (f) an email thread between Bermuda Road and EcoSteel

15   requesting assurance that the $2.1 million was held in an account and EcoSteel's response

16   that the contracts did not stipulate to holding client deposits in a trust and that Bermuda Road

17   needed to go through the court systems to acquire EcoSteel's private bank account

18   information.  (*See* Exhibits (#15-1)).

19         In response, EcoSteel argues that it has now registered as a Nevada foreign company.

20   (Opp'n to Mot. to Summ. J. (#22) at 3).  EcoSteel asserts that the portion of the Agreement

21   requiring a contractor's license is severable leaving the remaining portions enforceable.  (*Id.*

22   at 13).  EcoSteel contends that if the Court severs the labor and installation line item from the

23   Agreement the remainder of the Agreement would be enforceable.  (*Id.* at 14).  EcoSteel

24   argues that pursuant to Nevada law it did not need a license to do engineering/design work

25   or project management because its engineer, Joseph D. Crilly, was licensed in Nevada.  (*Id.*

26   at 15-17).  EcoSteel contends that its project management duties only included work that was

27   allowed by Nevada's engineering licensing statute.  (*Id.* at 17).  EcoSteel asserts that it was

28   only "a mere manufacturer supplying steel products" to Bermuda Road.  (*Id.* at 18).  EcoSteel

argues that Bermuda Road knew that EcoSteel did not have a contractor's license and is now seeking to take advantage.  (*Id.*).  EcoSteel asserts that unjust enrichment applies to it because EcoSteel agreed to place installation in its bid at Bermuda Road's request, EcoSteel told Bermuda Road that it lacked the license for installation and Bermuda Road continued to enter into the Agreement, EcoSteel did not know it was required to have a license at the time of bidding, and it was understood in June 2012 that Bermuda Road would amend the Agreement to sever the installation work from EcoSteel's scope of work and assign it to a general contractor.  (*Id.* at 20).

EcoSteel attached several exhibits in support of its opposition to summary judgment. The affidavit of Joss Hudson, President of EcoSteel, stated the following. (Hudson Aff. (#22-1) at 2).  EcoSteel specialized in providing "Materials & Engineering/Fabrication specifically for Steel Systems that [were] designed in a 3D Engineering process."  (*Id.*).  The process enabled EcoSteel to "virtually build all of the components of the building in a software environment" which was "more expedient and economical to ensure that the contractors [were] not field modifying parts after fabrication ha[d] already occurred and components [were] on site."  (*Id.*). EcoSteel was one of the few pre-engineered steel building companies in the country that utilized the concept of virtually building all components including the bolts in the holes that connected the structures.  (*Id.* at 2-3).  EcoSteel did not engineer building systems unless a materials contract was in place.  (*Id.* at 3).  EcoSteel employed engineers and architects but it was "not an engineering firm."  (*Id.*).  It was a "steel supplier that engineer[ed] its own products."  (*Id.*).  It did not sell its engineering services.  (*Id.*).

The affidavit stated the following.  (*Id.* at 4).  EcoSteel's written estimates notified Bermuda Road that "EcoSteel [did] not provide the erection labor, but once structural engineering and steel detailing [was] completed, the plans [could] be submitted for Erection quotes."  (*Id.*).  In the end, Bermuda Road's Thom Morse told Hudson that Bermuda Road wanted "a fixed price for the steel design, fabrication and delivery of the Products, as well as labor and steel erection costs."  (*Id.* at 5).  Hudson reminded Morse that EcoSteel was a design manufacturer and did not provide labor and steel erection services and was not

licensed to do so but had "several teams of erectors around the country that [it] had worked with in the past that [it] could bring in for the job." (*Id.*).  Acquiescing Bermuda Road's request, EcoSteel included the costs of labor and installation in its fixed price bid.  (*Id.*).  Hudson was not aware that EcoSteel needed a Nevada contractor's license at the time it submitted a bid for work that required a contractor's license.  (*Id.*).  He assumed that EcoSteel did not need a license until the time the work was to be performed.  (*Id.*).  On June 12, 2012, EcoSteel again advised the general contractor and Bermuda Road that it did not have a license to contract for installation.  (*Id.* at 7).  EcoSteel provided its design and engineering information and plans to the municipal building department, stamped by EcoSteel's Nevada licensed engineer, Joseph D. Crilley.  (*Id.*).  EcoSteel revised the design and engineering information pursuant to Bermuda Steel's requested changes and resubmitted elements to the building department as necessary.  (*Id.*).  In July 2012, EcoSteel raised the licensing issue again and proposed that either EcoSteel get licensed and subcontract the installation itself or credit back labor and help Bermuda Road and the general contractor, GKG, hire an erector.  (*Id.* at 7).  EcoSteel became domesticated in Nevada on October 22, 2012.  (*Id.* at 9).

EcoSteel attached a preliminary pricing estimate, dated November 30, 2011, for Bermuda Road which stated, *inter alia*, that "EcoSteel does not provide the erection labor, but once structural engineering and steel detailing is completed, the plans can be submitted for Erection quotes."  (Pricing Estimate (22-2) at 27, 31).  The pricing estimate stated that construction materials and services by others were not included or provided by EcoSteel.  (*Id.* at 34).

EcoSteel's meeting minutes, dated June 12, 2012, demonstrate that EcoSteel and GKG decided that GKG would likely "list EcoSteel as a 'sub contractor' since EcoSteel [was] not a licensed contractor in Nevada."  (Meeting Minutes (#22-3) at 25).  An email between Thom Morse and Hudson, dated June 14, 2012, demonstrates that Bermuda Road asked EcoSteel to "please check/confirm that an Engineering firm can hire a contractor to erect in this case."  (Contractor Email (#22-4) at 20).   An email between EcoSteel and Bermuda Road demonstrates that on, August 2, 2012, Bermuda Road sent EcoSteel the steel production

10

order but then on August 4, 2012, sent EcoSteel an email stating that the production notice release had been rescinded and to stop production.  (Production Notice Email (#22-4) at 7). On July 3, 2012, Clark County approved the plans for the Property.  (Plan Tracking Status (#22-5) at 2).

In reply, Bermuda Road argues that *Interstate Commercial* is "on all fours" and that EcoSteel fails to address that case.  (Reply to Mot. for Summ. J. (#29) at 5).  Bermuda Road asserts that the Agreement is not severable.  (*Id.* at 10-13).  Bermuda Road asserts that the evidence regarding any separate oral or implied agreements must be disregarded because the Agreement is complete and unambiguous.  (*Id.* at 14).

## I.   Registered Foreign Corporation

Pursuant to NRS § 80.055(2), a corporation which fails to register as a foreign corporation with the Nevada Secretary of State "may not commence or maintain any action or proceeding in any court of this State."  Nev. Rev. Stat. § 80.055(2).  A court must stay an unqualified foreign corporation's action until the foreign corporation qualifies.  *Exec. Mgmt., Ltd. v. Ticor Title Ins. Co.*, 38 P.3d 872, 876 (Nev. 2002).

In this case, EcoSteel filed its counterclaim on October 3, 2012.  (*See* Counterclaim (#12) at 7).  On October 22, 2012, EcoSteel became a registered foreign corporation in Nevada.  (Entity Search (#22-3) at 22).  As such, EcoSteel is a registered foreign corporation in Nevada and the case may proceed.

## II.   Validity of the Agreement[2]

In Nevada, "contracts made in contravention of the law do not create a right of action." *Vincent v. Santa Cruz*, 647 P.2d 379, 381 (Nev. 1982).  Pursuant to the Nevada Revised Statutes, a person or business entity "engaged in the business or acting in the capacity of a contractor" is barred from bringing an action on the contract or for compensation for performance thereof absent a duly-issued contractor's license from the state "at all times during the performance of such act or contract and when the job was bid."  Nev. Rev. Stat.

---

[2] This section addresses Bermuda Road's first cause of action for declaratory relief that the contract is null and void and EcoSteel's counterclaim for breach of contract.

1   § 624.320.

2   A contractor is synonymous with "builder." Nev. Rev. Stat. § 624.020(1). A contractor
3   includes a subcontractor or speciality subcontractor, but "does not include anyone who merely
4   furnishes materials or supplies without fabricating them into, or consuming them in the
5   performance of, the work of a contractor." *Id.* § 624.020(3). "A contractor includes a
6   construction manager who performs management and counseling services on a construction
7   project for a professional fee." *Id.* § 624.020(4). A contractor is "any person, except a
8   registered architect or a licensed professional engineer, acting solely in a professional
9   capacity, who . . . offers to undertake . . . by or through others, construct, alter, . . . any
10  building, . . . or other structure, . . . or to do any part thereof, including the erection of
11  scaffolding or other structures or works in connection therewith." *Id.* § 624.020(2).

12  Here, both parties acknowledge that EcoSteel is not a licensed contractor in Nevada.
13  (See Answer (#12) at 2). However, the parties dispute whether EcoSteel was acting as a
14  contractor under the terms of the Agreement. The Court finds that the Agreement, as a whole,
15  required EcoSteel to act in the capacity of a contractor because the Agreement stated that
16  EcoSteel would provide: (1) labor; (2) a steel erector that had all the required licenses,
17  insurance, and certifications needed to erect the steel in Clark County, and (3) project
18  management from initial design through completion. (*See* Agreement (#12-1) at 8, 13). As
19  such, the Agreement, as whole, required EcoSteel to act in the capacity of a contractor even
20  though it was not licensed in Nevada.

21  Nevertheless, the Court finds that the Agreement is severable.[3] Under the doctrine of
22  severability, "where a contract consists of several agreements, one of which is illegal, the
23  illegal portion can be severed if it does not destroy the symmetry of the contract." *Vincent*, 647
24  P.2d at 381. The Court finds that there were two agreements in this case. The first
25  agreement was for EcoSteel to provide structural engineering, steel detailing, fabrication, and
26  delivery of the steel products. This agreement did not require a contractor's license. The

27

28      [3] The Court notes that it has read *Interstate Commercial* but finds it inapplicable to the
        case at hand because the Court finds that the Agreement is severable.

12

second agreement was for EcoSteel to put Bermuda Road in contact with individuals/teams that could provide labor and steel erection services for the cost of $665,000. If EcoSteel intended to act as a construction manager and sought to build the structure by and through others, then this agreement required a contractor's license. However, if EcoSteel intended only to provide Bermuda Road with its labor and steel erector contacts, then EcoSteel did not need a contractor's license.

The Court finds that the contracts are severable because the evidence demonstrates that the parties knew that EcoSteel could only legally engage in the first agreement. The evidence demonstrates that, with respect to the second agreement, the parties contemplated how they could proceed absent EcoSteel's contractor's license. The evidence demonstrates that the parties contemplated whether EcoSteel should obtain a contractor's license, whether GKG would be the licensed contractor and EcoSteel a subcontractor, or whether EcoSteel would have to credit the labor costs back to Bermuda Road. Therefore, the Court finds that there were two agreements in this case.

The Court finds that the first agreement is enforceable and that EcoSteel may pursue its breach of contract claim against Bermuda Road. The Court finds that the second agreement is enforceable if EcoSteel intends only to provide Bermuda Road with its labor and steel erector contacts and does not engage in construction management duties that would require a contractor's license. The Court finds that, under the second agreement, Bermuda Road has an enforceable contract and can sue EcoSteel if EcoSteel cannot provide a team that can erect the steel structure for $665,000.

Accordingly, the Court denies Bermuda Road's motion for summary judgment (#15) on the first cause of action for declaratory relief that the contract is null and void. The Court also denies Bermuda Road's motion for summary judgment on EcoSteel's counterclaim for breach of contract (#16).

///

///

///

13

**III.    Unjust Enrichment**[4]

"An action based on a theory of unjust enrichment is not available when there is an express, written contract, because no agreement can be implied when there is an express agreement." *Leasepartners Corp. v. Robert L. Brooks Trust Dated November 12, 1975*, 942 P.2d 182, 187 (Nev. 1997).  The doctrine of unjust enrichment or recovery in quasi contract applies to situations where there is no legal contract but where the person sought to be charged is in possession of money or property which in good conscience and justice he should not retain but should deliver to another or should pay for.  *Id*.

In this case, there are two valid legal contracts.  As such, there can be no claim for unjust enrichment.   Therefore, the Court denies Bermuda Road's motion for summary judgment (#15) on its second cause of action for unjust enrichment. The Court grants Bermuda Road's motion for summary judgment on (#16) EcoSteel's counterclaim for quantum meriut/unjust enrichment.

///
///
///
///
///
///
///
///
///
///
///
///
///

---

[4]    This section addresses Bermuda Road's second cause of action for unjust enrichment and EcoSteel's counterclaim for quantum meruit/unjust enrichment.

**CONCLUSION**

For the foregoing reasons, IT IS ORDERED that Bermuda Road's Motion for Summary Judgment (#15) is DENIED.

IT IS FURTHER ORDERED that Bermuda Road's Motion to Dismiss Ecological Steel System's Counterclaims (#16) is converted into a motion for summary judgment. The Court DENIES in part and GRANTS in part the motion for summary judgment on the counterclaim. The Court denies Bermuda Road summary judgment on the first counterclaim for breach of contract but grants Bermuda Road's motion for summary judgment on the second counterclaim for unjust enrichment. Therefore, the only remaining claim in this case is Ecological Steel's counterclaim for breach of contract.

DATED: This 1st day of April, 2013.

_____
United States District Judge

15